May it please the court, my name is Scott Stewart and I represent the appellant, Andre Rene Floyd. If I may, Judge Silverman, I'd like to reserve two minutes for rebuttal.  Thank you, Your Honor. In this case, the district court granted summary judgment to the four defendants on Mr. Floyd's claims that they were deliberately indifferent to his serious medical needs.  The district court was correct, Your Honors, that a jury could conclude that the defendants were not deliberately indifferent. But the court was wrong to hold that a jury could reach only that conclusion. In fact, Mr. Floyd established tribal issues on each element of all of his claims, and this matter, therefore, should have gone to a jury at trial. If I can start, Your Honor, with the three defendants, what we might call the failure to diagnose defendants, I think the key sort of issue I want to home in on here is the subjective awareness, deliberate indifference issue, and also the harm issue. That seems to be where most of the briefing is. In the court below, the defendants didn't dispute that hepatitis C and the need for a diagnosis test was a serious medical need. So I think that's where most of kind of the heat is here. And on the deliberate indifference prong, I'd just like to emphasize that, you know, in his summary judgment papers, Mr. Floyd pointed nine or ten times in the first 11 pages of his pro se summary judgment to these storm warning risk factors. Forty percent of entering inmates were infected with hepatitis C around the time that he entered. He was an intravenous drug user before he entered. He had his racial background, and eventually his confirmatory blood test showing liver damage, confirming the very high likelihood of hepatitis C. He emphasizes over and over again, almost once per page, and yet in this case, and I think this is very telling, is that the magistrate judge, in addressing Mr. Floyd's arguments, did not address at all these risk factors that he emphasized, the evidence he got in on those risk factors, and just really what was the basis of his case against these three failure to test defendants. And I think that emphasizes just the fact that the district court really just didn't confront in this case the fact that there is a dispute, that there's evidence from which a jury could conclude that any reasonable doctor, particularly a doctor in the California state prison system in the early 2000s, would know that a patient presenting with these sorts of code red, very high likelihood, almost certain diagnosis of hepatitis C-type risk factors, that they would have to know that he was very likely infected. What was his evidence of that? As I understand it, he got just some pamphlets or miscellaneous papers, nothing from a doctor or anything. I think in addition to the pamphlets, Your Honor, we do have evidence of an eventual action by a doctor, Dr. Michelottos, in February 2004, where upon being presented with, in addition to those pamphlets, also the information in his medical file, particularly the blood test showing. Did that doctor say he should have been tested earlier? That doctor didn't provide information one way or another on that. Okay. So let's take that out of the equation for a second. What did he submit in support of his motion for summary judgment on this point, that he should have been tested, other than some pamphlets? It's the medical file indicating, the fact that he's, his file indicating that he's both an intravenous drug user and particularly the confirmatory liver enzyme test showing liver enzyme elevations consistent with damage that is, that would confirm a diagnosis that he likely should be tested for hepatitis C. So I think it's the liver enzyme test that really pushes this out of. Okay. And what doctor says that when you have those liver enzymes he should have been tested and wasn't? None of the doctors in this case say that. Mr. Floyd did the best he could during the course of discovery to try to, you know, get all this discovery out he could. It was difficult given his, you know, given his situation in prison. But he got all the evidence that he was available, able reasonably to get to where he did indicate that he was indisputably part of this clear risk pool. It's the sort of thing that California itself confirmed in 2006, where it enacted this law in light of this dangerous epidemic of hepatitis C. You know, the legislation like that doesn't just come automatically in a vacuum. It's a reflective element that this was really something that was ravaging these prisons. These doctors had worked in these prisons for quite a while. They, you know, they faced all sorts of incoming inmates with these kinds of risk factors. And the key thing here is that nobody disputes that, you know, these factors put him in this very high risk pool. And then we get this liver enzyme test that's confirmatory. It shows, you know, look, he's not just an outlier. He's not sort of on the outside of these overlapping Venn diagrams. He is very likely wracked by this disease. And the only thing the thing that we have to do in this circumstance, the obvious prescribed course of action in this case, is to order a hepatitis C diagnosis test. Because otherwise we can't treat him. We don't know what he has. We don't know what genotype he has. We can't start a viral, antiviral therapy. So the key thing is to do that.  Counsel, could I interject a question for you, please? Of course, Your Honor. Help me out a little with the Supreme Court's theory on deliberate indifference. So just in a common-sense way, what I'm wondering is, how can the doctors be deliberately indifferent to something that they don't know? And second, has the Supreme Court ever held there was deliberate indifference to medical needs by the failure to administer a diagnostic test? On the first question, Your Honor, I think the key interpretation comes from the Farmer v. Brennan case, which this Court explained or elaborated upon in Kahn v. City of Reno, where it says when you have we can conclude or a jury can conclude in some circumstances based on the mere fact that the medical problem was obvious, that, you know, that the doctor was faced with this obviousness and he must have drawn the conclusion that action was warranted. And if in the face of just obvious signs he did not act, we can draw the inference that that was deliberately indifferent. On your second question, I'm not aware of cases holding that the failure to test constitutes an Eighth Amendment, you know, a particular Eighth Amendment violation. I'm not aware of the Supreme Court having faced that particular pattern. But at the level of generality the Court has defined it, it's termed in failure to act. You know, if there's pepper spray roaming the halls and it could wreak harm on prisoners' breathing, if a prisoner is in severe pain and needs, you know, needs hip surgery, if somebody is showing signs that they're suicidal and doctors fail to act in that circumstance, it's a failure to act. And all we're saying is that this fits right in with Kahn and Farmer and Still about failure to act in the face of an obvious and serious need that caused Mr. Floyd harm here. If I may, Your Honor. Thank you. What harm exactly was caused? The harm, I think the central harm, Your Honor, is the decreased effectiveness of eventual antiviral treatment. What's your evidence of that? On Dr. Soghi at page 57 of the excerpts, and this is embraced by other defendants at, I believe, page 52 of the excerpts, indicate that the longer somebody has the illness, the less likely treatment is to be effective. There are also, we cite these in our various pages about fibrosis in the liver. Increased fibrosis and problems like that cause further harms. Did he have increased fibrosis in his liver? He had higher fibrosis, high fibrosis by the time he was actually tested. He didn't get the opportunity to have kind of comparative pre-2005, I believe, evidence about his fibrosis because no doctor, the defendants are responsible essentially for the lack of evidence on that. But I think that would be the key harm. If I may, Your Honor, can I say? Sure. Thank you very much. Thank you, Justice Sotomayor. Good morning. Before we turn the floor over to you, are you and counsel spending your time? How are you going to do that? I was speaking for 7 minutes and Mr. Rivera was speaking for 3. Great. Would you put 7 minutes on the clock, please? Great. Thank you. Thank you. Good morning, Your Honors, and may it please the Court. My name is Timothy Delgado, and I represent Drs. Cantwell, Dang, and Soja. Mr. Rivera here represents Dr. Hasadzri, and he'll be speaking for 3 minutes. I think Mr. Stewart's correct that the strongest arguments on behalf of Mr. Floyd have to do with Drs. Cantwell and Dang and particularly the subjective prong of the test for deliberate indifference. That's where I'd like to spend my time. When Mr. Floyd was admitted to the California prison system in 2001, he came in with a history of seizure disorders. He was prescribed anti-seizure medications, one of the side effects of which is elevated enzyme levels. So in the fall of 2001, he was tested to see whether or not he was showing any side effects, and one of those results was, in fact, a mildly elevated liver enzyme. There was no reason to believe at that time, though, that Mr. Floyd had hepatitis C, and in the next three years, while he was at Corcoran State Prison, no other prison physician tested him for hepatitis C. Now, is there an established protocol for when one ought to test for hepatitis C? After, I believe, two positive responses with respect to the virology, Your Honor, and here there was no positive responses, in fact. And is that protocol established throughout the medical profession, or is that something that's been established within the prison system? I believe that's endemic to the California State Prison System, Your Honor. I see. It's not an established protocol in the medical profession? I do not believe so, Your Honor. I know that the record go ahead. So it's very possible that somebody who was not in prison would have been tested earlier? Your Honor, it's possible that someone would have been. But again, I guess the critical factor here is that in spite of the fact that Mr. Corcoran was not in prison, none of the other prison physicians, none of them had any reason to believe that he had any of these, these. I'm not terribly impressed with that fact. I guess what I'm trying to find out is whether there's an established protocol in the medical profession for when one should test for hepatitis C and whether that protocol was followed or something that is more, that is less stringent and established by the prison was followed. With regard to a protocol within the medical community, Your Honor, I don't know the answer to that question. I apologize for that. I would note, however, that in speaking to the, essentially the standard of care that was followed throughout the course of this case and the fact that Mr. Floyd was seen by dozens of prison physicians during his stay at Corcoran State Prison, qualified immunity is designed to protect for reasonable mistakes of fact. And here, with the benefit of hindsight, it's very easy to look back and cobble together these isolated different, I suppose, storm-warning signs of infection as Mr. Stewart has characterized them. But for qualified immunity, the test is what a reasonable physician or a reasonable government official standing in the shoes of the defendant would have thought in its time. And should that be measured by what a reasonable prison doctor would do or what a reasonable physician would do, period. Reasonable within the medical, the larger medical community, Your Honor. And that's what seems to be lacking on the issue from what you tell me. We don't know, do we? In the record, we don't know. And there's no evidence in the record that I can point to on that point. With that said, however, in this case, again, qualified immunity is designed to protect against what a reasonable official in the defendant's shoes would have thought based on the specific facts. Now, at the broadest level of generality, Mr. Floyd has characterized this right to, essentially, the right to prison and medical care. But the Supreme Court has said the broadest level of generality is not the governing standard. It is, instead, one has to be defined specifically and with respect to the conditions that the defendant had in mind. In this case, that would be essentially the right to diagnostic testing when such testing is medically indicated. I could pursue this line of questioning just one step further, sir. With respect to the actual administration of the medication, there was a criterion for how much should be administered, and apparently a criterion for how much of a recovery had to be shown for there to be a continued administration of the pharmaceutical. Were those standards prison standards, or were those standards standards in the greater medical community? Your Honor, on that point, those standards were within the larger medical community. Within the larger medical community. Yes, Your Honor. And in terms of those, and with respect to Dr. Sajji's decision to prescribe the, I guess, the 1,000 milligrams as opposed to the standard 1,200, it was because of Mr. Floyd's genotype and the risk factors that he specifically presented with his prior history of hemolytic anemia, depression, and seizure disorder. That's the physician's testimony, right? Yes, Your Honor. That's well within the medical judgment that's allowed under the test for deliberate indifference. There's evidence throughout the record that Dr. Sajji pursued the course of treatment that he did based on his informed medical judgment, and there's nothing, nothing contrary that would suggest that. Are there prison regulations that limit, to a greater degree, or the discretion which a physician might or might not have to deviate from these standards? For instance, if a physician, 95% remission, he says, well, in the civilian world, he might say, well, another 5%, I'll try it a bit longer. Is there any regulation in the California prison system that says, no, you don't have that discretion? Well, Your Honor, prison officials, as Dr. Sajji mentioned in his interrogatory responses, CDCR physicians are not allowed to perform any type of experimental testing on, experimental treatment on prisoners. I understand. Anything that falls outside of the standard of care. But I'm saying if there's no testimony that a civilian physician might have, in the civilian community, might have more some discretion with respect to those guidelines and a prison official might, a prison doctor might not. Is there anything to that, of that nature in the prison regulations? There's nothing in the record that would support that line of argument, Your Honor. And with the limited time I have, I would just like to turn to the harm prong. There was no harm in this case. There's absolutely no evidence in the record that substantiates Mr. Floyd's claims of liver damage lasting. In terms of the, he had a liver biopsy and he. And does that go to his damage or does that go to the, whether he states a claim? That goes to actually whether he states a claim, Your Honor, the subjective prong of deliberate indifference. First, there has to be the actual purposeful delay or intentional failure to treat and then harm caused by that deliberate indifference. Suppose they totally neglect his case and then somehow he recovers. Are they, they're not liable for deliberate indifference? No, Your Honor. Suppose he broke a leg and they decide not to treat him. They don't want to take the trouble to send him to the hospital and have his leg fixed. But, you know, after a year or so, the bone heals. There's no cause of action against the prison. Well, there may be, Your Honor, in that case, because the harm would be the intermittent harm that happened during the, during, I guess, the interregnum in the time that there was the actual harm and the full recovery. In this case, that certainly hasn't been shown in any form. In fact, the liver, the architecture of the actual physical liver itself has improved from a grating in 2005. But they had to stop the interferon and the other drug because it wasn't showing itself to be sufficiently effective. That's correct, Your Honor. His argument is that's because they let it go on too long. Well, Your Honor, the record also shows that because Mr. Floyd had most likely been infected with the hepatitis C virus for decades, there's no reason to think that a two- to three-year gap would have caused any appreciable difference in his response to the treatment. And, in fact, What's the evidence of that? Is that you or is that, is there an expert who said that? No, Your Honor, that's at the appellant's excerpts of records at page 57. Who are you quoting there? I'm quoting Dr. Sajay's interrogatory responses. And what he said there was that the standard treatment available in 2003 involved alpha-interferon and ribavirin. The combination therapy, which was more advanced in 2006 and had higher response rates, was made up of regulated interferon and ribavirin. Because Mr. Floyd did not respond in 2006, there's no likelihood that he would have responded to the earlier, less effective treatment in 2003. If I may reserve the balance of my time for Mr. Rivera. Sure. Thank you, Mr. Delgado. Thank you, Mr. Delgado. Good morning, Your Honor. May it please the Court. Jesse Rivera, appearing on behalf of Dr. Hassadri. A couple of items that I think are important to note. Dr. Hassadri only treated Mr. Floyd from June of 2001 through July of 2002. There has been a lumping of Dr. Hassadri in with the other physicians with regards to medical information that became known after Dr. Hassadri was treating Mr. Floyd, and it's important to focus in on the time frame that Dr. Hassadri was treating him. With regards to the issues as described with regard to the deliberate indifference, I believe that the perhaps the most instructive information we have is on the Estelle case, if I may. As the Supreme Court noted, the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter of medical judgment. A medical decision not to order an X-ray or other measures does not represent cruel and unusual punishment. In this particular instance, Mr. Floyd's position is that Dr. Hassadri should have ordered a second test once the first test came out that was slightly elevated levels in the liver enzymes. However, the facts are that Dr. Hassadri was treating Mr. Floyd for seizures. He was under medication for bilantin and myosilin. With regards to that, Dr. Hassadri, who had just commenced treating Mr. Floyd in June ordered some tests in October. Those testing results came known to him in November that showed slightly elevated levels of liver enzymes. That's important because Dr. Hassadri was specifically looking for that as a result of his seizures because bilantin does cause and may cause elevated levels in the liver enzyme. It was Dr. Hassadri's view that it was related simply to the bilantin use, nothing more. There was no other symptoms, no other signs, no other information in the record to show that Dr. Hassadri was aware that Mr. Floyd may, could have, or was susceptible to hepatitis C. They say there was evidence that he had a history of intravenous drug use, that there's an epidemic of hepatitis C in the prison, that he's African American, you know, the litany, and therefore you put the whole story together. I do. This is a classic example of just lumping things together because they have not indicated where those records, where that information came from. The first place that we noted that is from Dr. Soghi, which was in 2006. We have a four-year gap with regards to when that information was inputted into the records, assuming it was, and I believe that Dr. Soghi stated it was, so I'll accept that. But we don't know when that happened. There's no information that Dr. Hassadri was aware of any of that information. Perhaps it happened once, and I suspect this is the case, that it happened afterwards once he had the liver biopsy, once that happened, and then they start making inquiries to Mr. Floyd as to what was going on because that's what they were focusing on. The focus of Dr. Hassadri was simply on the Dilantin use of the seizure medication. Therefore, it was perfectly reasonable for him just to monitor him the way that he was doing so, not to order an additional test unless he felt it was warranted. And that's specifically what I think the case law states. Just one brief matter. Roberts. I see you're out of time. Let me just see if the ---- Oh, I'm sorry. I am. Thank you. Anything further, Your Honor? No. Thank you. Thank you. Mr. Stewart, back to you. Thank you, Your Honor. I think I'd like to just emphasize very quickly your point, Judge Silverman, about the harm here. I think the dispute is really over quantum of harm. You know, a jury could say, look, you know, a few years delay, that didn't make a huge difference, but they could conclude that it was a longer history and, therefore, that longer period of time is what led to his inflammation and a crosis in his liver and that if he could have just gotten the treatment a little bit earlier, he might have had the full log drop. And it's that dispute, that's enough to show harm here is a reasonable likelihood of future harm, given that he has not gotten a sustained viral response, that under Helling v. McKinney is enough to say, you know, down the line, he could develop one of these liver problems. And it could have gone a lot better for him, and he could have gotten the full sustained treatment had they diagnosed earlier. Perhaps the jury would agree. Yes, Your Honor. Counsel, to ask you a question on this harm issue raised by Judge Silverman's questions and your argument, as a matter of deliberate indifference theory, can there be a case where a court says there was deliberate indifference, but no harm, and there can be a war, of nominal damages? Or does the standard require harm to make out a deliberate indifference case? Are there any deliberate indifference cases involving nominal damages, I guess, is the simpler way to state? If I may answer, Your Honor. I'm not aware of nominal damages cases in this Court's case law, Your Honor. I'm not aware of any cases prohibiting one way or another. All I've seen is that, you know, once you get to where a jury could conclude that there's harm, that, you know, be it a very small amount, you know, be it a large amount, that's enough as far as getting past the summary judgment stage, and that's what we're saying happened here. Thank you, Your Honor. Thank you very much, Mr. Stewart, Mr. Rivera, Mr. Delgado. The case just argued is submitted. Mr. Stewart, we especially want to thank you for taking this case on a pro bono basis and for doing such a good job with it. Thank you.
judges: Ripple, Silverman, Gould